IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

OLAJUWON SMITH                                                    PLAINTIFF

v.                              Civil No. 6:19-CV-06003

DR. LIGGETT (Correct Care Solutions),                            DEFENDANTS
DREAM REDDICK YOUNG
(Health Care Administrator, CCS),
CORRECT CARE SOLUTIONS, and
ADAM CLARK (Lieutenant, Ouachita River
Correctional Unit, ADC)

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

This is a civil rights action provisionally filed pursuant to 42 U.S.C. § 1983. Pursuant to

the provisions of 28 U.S.C. § 636(b)(1) and (3) (2011), the Honorable Robert T. Dawson, United

States District Judge, referred this case to the undersigned for the purpose of making a Report and

Recommendation.

Currently before the Court is a Motion for Partial Summary Judgment on the Issue of

Exhaustion by Defendants Correct Care Solutions, Liggett, and Reddick Young (the "Medical

Defendants"). (ECF No. 55). Also before the Court is a Motion for Partial Summary Judgment

on Exhaustion by Defendant Clark. (ECF No. 66).

## I.        BACKGROUND

Plaintiff filed his Complaint in the Eastern District of Arkansas on December 31, 2018.

(ECF No. 2). It was transferred to this District on January 3, 2019. (ECF No. 4). Plaintiff filed

an Amended Complaint on January 22, 2019. (ECF No. 10). Plaintiff alleges he was denied

medical care by Correct Care Solutions ("CCS") and CCS employees, Defendants Dr. Liggett and

Reddick Young, on August 9, 2018. (ECF No. 10 at 4). In an attachment to his Complaint (ECF

1

No. 10-1), Plaintiff provided additional details concerning his claims. Plaintiff's alleges he had been complaining to CCS about knee problems for two years. (*Id*. at 1). He was then attacked by three other inmates and his knee was "broken" on August 9, 2018. (*Id*.). He states his knee would not have been broken from the attack if CCS had done something about his knee earlier. (*Id*.). He was seen by Dr. Liggett that same day, while he was bleeding "profusely" and his leg was swollen. His leg was x-rayed, and he was taken to isolation. He was still bleeding and was given no pain medication. (*Id*. at 2). Plaintiff alleges he was kept in the isolation cell with no crutches or other way to move and given only one Naproxen a day for three weeks. (*Id*.). He was not examined further by Dr. Liggett during the time in isolation. (*Id*.). He was not given crutches or a wheelchair when released from isolation, and he had to have other inmates carry him to meals. (*Id*.). Plaintiff alleges Dr. Liggett and CCS told him that it was policy to send victims of extreme violence to isolation and that this "was something they have always done." (ECF No. 10 at 5). Plaintiff alleges that Dr. Liggett has several grievances filed against him for ignoring and delaying treatment for serious inmate medical needs. Finally, Plaintiff alleges it is a custom of CCS to backdate computer files to show treatment being provided on an earlier date than when it was actually provided. (ECF No. 10 at 5).

Plaintiff was examined by a knee specialist at the National Park Medical Center on September 7, 2018. This specialist told him his knee was "completely out of place" and he needed surgery, but he would need a CT scan first to determine the type and magnitude of surgical procedure needed. (ECF No. 10-1 at 3). Plaintiff alleges the specialist told him that his knee was completely "out of socket" and that, for an injury of this type, treatment should not be delayed any longer than two weeks. (*Id*. at 3-4). He further told Plaintiff that if there was much more of a delay prior to surgery he would have to rebreak the knee to put it back in the correct position. (*Id*.).

He received the CT scan and the recommendation for surgery was given to Reddick Young.  (*Id*. at 4).

Plaintiff alleges that 20 days later he was taken to another knee specialist at a different hospital.  This specialist took an x-ray of his knee and told him it was now too late to perform surgery on the injury, and instead put him in a knee mobilizer and applied pressure.  The specialist told him that if he had been brought to him sooner, he would have recommended surgery.  (*Id*. at 4).  Plaintiff alleges that Reddick Young deliberately ignored the first knee specialist's recommendation and waited a substantial amount of time to send him to a second specialist.  (*Id*. at 4-5).  Plaintiff alleges that his knee is still extremely swollen, and he is in extreme pain.  He asked to go to a third specialist, but this request was denied.  (*Id*. at 5).  He alleges the CCS staff gave him a script for a wheelchair and crutches, but nothing was given for the swelling and pain.  (*Id*.).  He claims his knee is dislocated, and something is crushed inside of it.  (*Id*. at 2).  Every nurse he sees at sick call tells him something needs to be done about his knee and refers him to see a doctor.  (*Id*. at 5).

Plaintiff was taken back to the second knee specialist on November 26, 2018.  The specialist advised that he continue to use the knee mobilizer and rest his leg in an elevated position.  (*Id*. at 7).  Plaintiff continues to receive no pain medication other than Naproxen.  (*Id*.).

He alleges that Lt. Clark interfered with the treatment ordered by the doctor and denied him access to courts on October 14 or 15 of 2018.  (*Id*. at 5).  Lt. Clark arrested Plaintiff for contraband on October 14, 2018.  He removed Plaintiff from his wheelchair and made him walk from the barracks to the infirmary and then to isolation.  (*Id*. at 6).  Plaintiff had orders that he was to have a combination of the knee mobilizer and either crutches or a wheelchair for mobility, but Lt. Clark denied him all of these.  (*Id*.).  This caused his entire leg to swell and increased his pain.

(*Id*.).  Plaintiff was ultimately acquitted of the disciplinary charge for the incident.  (*Id*. at 5).  Lt. Clark also allegedly destroyed Plaintiff's legal work.  (*Id*. at 6-7).

At the end of the attachment to his Complaint form, Plaintiff states "this is not part of the lawsuit just showing a custom or pattern of CCS changing dates in the computer and to explain why the grievance of 9/5/18 contradict itself."  He then describes an incident when he was released from administrative segregation and states there was no way the script for his knee mobilizer and crutches could have been written on the date listed in the computer system.  (*Id*. at 8).

Plaintiff proceeds against all Defendants in both their official and personal capacities.  (*Id*. at 4-5).  He seeks compensatory and punitive damages, and he wants an injunction to prevent Lt. Clark from interfering with his or other inmates' legal paperwork in the future.  (ECF No. 10 at 7).

Correct Care Solutions ("CCS") filed its Motion to Dismiss on May 2, 2019.  (ECF No. 20).  Plaintiff filed his Response on June 4, 2019.  (ECF No. 30).  On December 30, 2019, Plaintiff filed a Motion to Amend his Complaint.  (ECF No. 52).  On January 14, 2020, the Motion to Dismiss was denied.  (ECF No. 55).

On January 22, 2020, the Medical Defendants filed their Motion for Partial Summary Judgment on the Issue of Exhaustion.  (ECF No. 55).  On January 23, 2020, Plaintiff's Motion to Amend was granted, and he was directed to file a Second Amended Complaint.  (*Id*.).  (ECF No. 58).  Plaintiff did so on February 2, 2020.  (ECF No. 62).

In his Second Amended Complaint, Plaintiff provided additional detail to his First Amended Complaint, and adds a claim that Defendant CCS/Wellpath[1] has a custom or policy of backdating, withholding, and falsifying evidence in their computer system to "cover up there [sic]

---

[1] During the pendency of this lawsuit, CCS and several other prison medical providers merged to form WellPath, LLC.

4

denial of medical care. . . ." (ECF No. 62 at 1). Plaintiff had previously noted issues with medical data entry is his First Amended Complaint, but stated "this is not part of the lawsuit just showing a custom or pattern of CCS changing dates in the computer and to explain why the grievance of 9/5/18 contradict itself." (ECF No. 10 at 8).

Plaintiff alleges he wrote an emergency grievance about his knee on October 17, 2017 after he first saw Dr. Liggett upon his transfer to the Ouachita River Unit from the Varner Unit. (ECF No. 62 at 8). Plaintiff attached a copy of the Unit Level grievance form, dated November 6, 2017, to his Second Amended Complaint.[2] (ECF No. 62 at 23). His knee complaints were ignored, and then the knee was broken[3] on August 9, 2018. (*Id*. at 8). Instead of calling for an ambulance, Dr. Liggett told the guards he was "done with" Plaintiff and to take him to Isolation. Plaintiff alleges Dr. Liggett sent him to Isolation with "blood still running out of my head," no pain medication, and no way to move around because his wheelchair was confiscated. (*Id*. at 9). Plaintiff was in Isolation for three weeks and heard nothing from Dr. Liggett the entire time he was there. Plaintiff repeated his complaints about the conditions and lack of medical treatment in Isolation. (*Id*. at 9). Plaintiff alleges:

> I was unable to write a grievance on those issues because the correctional officers always informed me that they was not allowed to give me one of their ink pens to write with and policy prohibits them from getting a pen from another inmate and bring it to me after. I finally ended up with a grievance five days later after the incident – ADC policy states you can't grieve an issue over 15 days later. I was held in isolation nearly three weeks.

(*Id*. at 9).

---

[2] This emergency grievance does note that he had been having pain and swelling in his knee, and Dr. Liggett felt something in the joint, but told Plaintiff that he had "milked that knee pain for three months" and should "stop complaining." It does not appear, however, that it progressed to Step Two of the grievance procedure, and was therefore not exhausted.

[3] In the Grievance Appeal Response for OR-18-01162, Plaintiff's injury was described as "an acute compression fracture involving right lateral tibia plateau with mild displacement and associated joint effusion." (ECF No. 57-1 at 28). The response also noted that Defendant Liggett ordered x-rays of the knee the day it was injured on August 9, 2018, reviewed them on August 16, 2018, noted there was no clinical need for follow-up, and scheduled an orthopedic consult for September 7, 2018.

A sick call nurse told Plaintiff he needed to stay off his knee because something inside of it was crushed, and he had an appointment scheduled for September 7, 2018. (*Id*. at 10). Plaintiff saw his first knee specialist at National Park Medical on September 7, 2018, where a CT scan was done. Plaintiff believes Reddick Young is the individual who approved the CT scan because discovery in the case revealed that such approvals are part of her job. (*Id*.)

Plaintiff alleges he put in another grievance on September 18, 2018, complaining about how the National Park Medical Center doctor recommended emergency surgery, but he had yet to go back to the hospital for that surgery. He alleges that Dr. Liggett and Reddick Young deliberately ignored his "serious medical need for surgery. (*Id*. at 11). He was then sent to a different specialist on September 20, 2018, as described in his First Amended Complaint. (*Id*.). After seeing the second specialist, he came back and wrote another grievance that same day. He alleges that the medical department is run by Dr. Liggett and Reddick Young, and asks to see a third specialist, again noting that the "extreme delay" had interfered with his treatment options. (*Id*. at 12).

Plaintiff alleges that, during the pendency of this case, he was transferred to the East Arkansas Regional Unit, and has now been seen by a third specialist at the University of Arkansas for Medical Sciences. This specialist repeated that an injury like his should have been treated within two weeks. This specialist told him that to fix the problem now, he would have to rebreak the bone. Additionally, there is now a hole in Plaintiff's bone from the injury which he would have to "drill around to properly sit one bone on top of the other." (*Id*. at 13). He would then need to shave Plaintiff's bones down to make them fit again, and one of Plaintiff's legs would be shorter than the other. The specialist told him that he believed that attempting to fix his knee now would likely do more harm than good. (*Id*.). The comments and prognosis this specialist sent back to

the ADC stated that the prison had been negligent in getting Plaintiff to a hospital in a timely manner. (*Id*. at 14).

Plaintiff repeats his claim that Lt. Clark interfered with his medical treatment plan when he forced him to walk to isolation and stripped him of his medical supplies for a disciplinary charge that was ultimately dismissed. (*Id*. at 6, 18-19). Plaintiff also alleges Lt. Clark destroyed legal work while he was in Isolation, causing him to have difficulty with a hearing in another case on January 8, 2019. (*Id*. at 19-20). Plaintiff characterizes the destruction of his legal paperwork as a denial of access to courts. (*Id*. at 6, 22).

Lt. Clark filed his Motion for Partial Summary Judgment on Exhaustion on February 11, 2020. (ECF No. 66). Plaintiff filed his Response to the Medical Defendants' motion on February 13, 2020. (ECF Nos. 70, 71). He filed his Response to Lt. Clark's motion on March 5, 2020. (ECF Nos. 74, 75). Lt. Clark filed a Reply to Plaintiff's Response on March 12, 2020. (ECF No. 78).

## II.      LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.    ANALYSIS

The Medical Defendants argue partial summary judgment in their favor is appropriate because Plaintiff failed to administratively exhaust any grievance against either CCS or Reddick Young related to his claims in this case. (ECF No. 55 at 4). Further, they argue the only grievance Plaintiff administratively exhausted against Dr. Liggett was for the delay in getting Plaintiff to a specialist for medical treatment for his knee from August 9, 2018 to September 7, 2018. (*Id*.).

Plaintiff argues that the ADC Grievance Policy permits the Chief Deputy/Deputy/Assistant Director to waive procedural requirements and process grievance appeals at their discretion. (ECF No. 70 at 2-3) (citing ECF No. 57-1 at 14(3)). He argues that if the requirements are waived, and the grievance appeal processed, the grievance is then administratively exhausted. (*Id*. at 3). He further argues that he had no way of anticipating that Dr. Liggett would retire after Plaintiff filed his grievance regarding his knee, and that Reddick Young would therefore oversee the rest of his treatment. (*Id*. at 16). Because he could not anticipate Dr. Liggett's retirement, and because this

was a matter outside of the ADC's control, the issue was not grievable.[4]  (*Id*. at 17).  Reddick

Young should not, therefore, be dismissed from the case simply because Plaintiff did not name her

in a grievance.  (*Id*. at 15-17).  Finally, Plaintiff argues that, in responding to one of his grievances,

the ADC Director stated that Dr. Liggett was acting in accord with CCS policy.[5]  Therefore,

Plaintiff asserts CCS should not be dismissed from the case.  (*Id*. at 70).

Lt. Clark argues partial summary judgment in his favor is appropriate because Plaintiff

failed to exhaust his grievance concerning Lt. Clark's alleged indifference to his medical needs

prior to filing this lawsuit.  (ECF No. 67).

Plaintiff argues that the Court ordered him to file an Amended Complaint, and the Order

states that the First Amended Complaint supersedes the Original Complaint.  Therefore, the filing

date of the First Amended Complaint should be used to determine if he exhausted his grievance

prior to filing this lawsuit.[6]  (ECF No. 74 at 3).

In his Reply, Lt. Clark argues that the PLRA "clearly contemplates exhaustion prior to the

commencement of the action as an indispensable requirement," and that "the district court must

look at the time of filing, not the time the district court is rendering its decision, to determine if

---

[4] Plaintiff cites to ADC Administrative Directive 14-16 for this argument.  (ECF No. 57-1 at 5-6).  According to AD 14-16, "Anticipated events (i.e., events or activities which may or may not occur in the future)" and "Matters beyond the control of the Department of Correction, including issues controlled by State or Federal law or regulation" are not grievable." (*Id*.).  Plaintiff's argument, while creative, appears to be based on a misreading of AD 14-16.  Further, Dr. Liggett's retirement in no way prevented Plaintiff from filing a grievance against Reddick Young regarding his medical care if he wished to do so.  Indeed, a considerable portion of AD 14-16 explicitly addresses the approved procedure for grievances about medical issues.  Therefore, the Court will not address this argument any further.

[5] Plaintiff appears to be referring to the Grievance Appeal Response to OR-18001162.  The final sentence in the Response states: "Your outside appointments were held within the timeframe allowed per policy; therefore, your grievance is without merit." (ECF No. 57-1 at 28).  The Response does not identify if it is referring to a CCS or ADC policy.  Plaintiff, however, provided a copy of the ADC Medical and Dental Services Division Operational Policy and Procedure, and cites to it in support of his argument.  As it appears that the policy was not, in fact, a CCS policy, the Court will not address this argument further.

[6] Plaintiff also points out that he is responding "blindly" because he never received a copy of Lt. Clark's Brief in Support of his Motion.  (ECF No. 74 at 1).  In his Reply, Lt. Clark admits that the Brief was mistakenly left out of correspondence mailed on February 11, 2020.  Plaintiff informed him of this by correspondence on February 24, 2020, and copy of the Brief was placed in the mail that day.  Lt. Clark correctly states that if Plaintiff felt he needed more time to Respond, he could have filed a motion for an extension of time, as he did for the Medical Defendants' motion. (ECF No. 78 at 1).

exhaustion has occurred." (ECF No. 78 at 2) (quoting *Johnson v. Jones*, 340 F.3d 624, 627-28 (8th Cir. 2003). Lt. Clark further argues the ADC grievance policy explicitly advises inmates that they must fully exhaust his administrative remedies prior to filing a Section § 1983 lawsuit. (ECF No. 78 at 2).

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). "[T]o properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal quotation marks and citation omitted). The "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id*. A prisoner's remedies are exhausted "when [the] inmate pursues the prison grievance process to its final stage and receives an adverse decision on the merits." *Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012). The purpose of the exhaustion requirement is to "give the agency a fair and full opportunity to adjudicate their claims." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "Proper exhaustion demands compliance with an agency's deadlines." *Id*.

A.    **Administrative Exhaustion - Medical Defendants**

The Medical Defendants argue that Plaintiff filed and administratively exhausted only two medical grievances in the during the three years prior to the filing of this case on December 31, 2018. (ECF Nos. 56 at 12; 57-1 at 22). Based on these grievances, they argue CCS and Reddick

Young should be dismissed from the case as Defendants, and that Plaintiff's claims against Dr.

Liggett should be limited to the delay in getting Plaintiff to a specialist for medical treatment for

his knee from August 9, 2018 to September 7, 2018.

### 1. The Grievances

The first grievance, **OR-18-01125**, was initiated on September 5, 2018. (ECF No. 57-1 at

23-26. In this grievance, Plaintiff stated:

> I got x-rayed on 8-9-18 but is yet to hear anything of the results or the condition of
> my head and knee. My head and knee are constantly in excruciating pain, and is
> not getting any better. I am also not receiving any kind of treatment that I know
> my condition warrants. . . .I am being totally discounted by medical staff here at
> O.C.R.U. as I have been at previous A.D.C. units that I've been incarcerated in.
> This is a clear case of "deliberate indifference" that constitutes clear and unusual
> punishment for not being treated properly.

(*Id*. at 23). The initial response, signed by Reddick Young and dated September 7, 2018, states

"Your medical needs has [sic] been addressed." (*Id*.). The Health Services response to the Unit

Level Grievance states:

> (652) You grieved on September 5, 2018, that you had not been informed of the
> results of your head and knee x-rays taken August 9.
>
> Dr. Liggett reviewed the reports of your x-rays taken August 9, on August 16, and
> noted there was no clinical need for follow-up, based on the results. This
> notification was sent to you via mail; however, on that same date (August 16) he
> noted your report indicated an acute compression fracture involving right lateral
> tibia plateau with mild displacement and associated joint effusion. He submitted a
> consult referring you to an orthopedist for which you were seen September 7 and
> 20.
>
> Due to Dr. Liggett noting no follow-up was needed; this grievance is with[7] merit.

(*Id*. at 24).

Plaintiff appealed this response, stating:

> I never received [sic] any notification informing me of nothing. I was actually
> thrown in isolation bloody with a broken leg after the x-ray was done. Cameras

---

[7] While the document states "with" merit, it is apparent from the context that it meant "without" merit.

would show that at no time especially the time this response ~~was~~ say I received notification on my injury. ~~that they~~ I received no mail call period.  I was barely able to get my food tray out the bars.  This is not the only unit I have been complaining about my knee this was a well documented problem way before my knee ended up broken.  Dr. Liggett was informed by me on Oct. 2017 of my injuries but he ignored them just like he ignored them when my knee was actually broken.

(*Id*. at 24).  The Appeal Response by ADC Director Rory Griffin repeats the text of the Unit

Level Response.  It then states that Plaintiff's appeal attempted to raise new or additional issues

or complaints, upheld the response of the medical department, and found Plaintiff's appeal to be

without merit.  (*Id*. at 26).

Grievance **OR-18-01162** was initiated on September 20, 2018.  (ECF No. 57-1 at 27-30).

Plaintiff stated:

Today I went and seen another knee specialist.  This time I went to St. Vincent.  This knee specialist informed me that my knee is broken and out of socket, but due to it taking me so long to do something about it my knee is in the process of healing itself.  This specialist also stated "a injury with the magnitude of mine's require a person to get a specialist attention within two to three weeks of the injury in order to properly fix the problem.["]  Dr. Leggett's negligence in getting me to see him in a timely manner would require him to rebreak my leg from the already broken state it's in to fix it properly.  But he wouldn't recommend that because he would have to retear cartilage and tissue in my knee that shouldn't have been healed in the first place.  Now this specialist is telling me to gradually apply pressure to my broken leg until I can eventually stand on my own which don't make sense to me because I can't even stand on my broken leg to take my boxers off to even take a shower.  Dr. Leggett has sent me to two different specialists with two different opinions.  But yet in still I can't walk, stand, or move to fast without my knee giving out.  Now Dr. Leggett is taking the second specialist word over the first one But nobody asking me what's really wrong.

(ECF No. 57-1 at 27).  The initial response, signed by Reddick Young and dated September 21,

2018, states only "Your medical needs are being addressed."  (*Id*.).  The Health Service Response

to the Unit Level Grievance states:

(655) You submitted a grievance on September 20, 2018, grieving that you had just seen the "knee specialist" and he said your knee was broken and out of socket, but due to the amount of time that had passed since your injury occurred your knee had started to heal.  You state that he said "an injury with the magnitude of mines

12

require a person to get a specialist attention within two or three weeks of the injury in order to properly fix the problem." You state Dr. Liggett's negligence in getting you seen timely would cause the specialist to have to re-break your knee to fix it but he did not recommend this because it would involve re-tearing healing cartilage. You state you had seen two different specialist[s] but Dr. Liggett took the advice of the second one who wanted you to gradually apply pressure to your knee, which you are unable to do.

Per policy, only one issue will be addressed per grievance.

You injured your right knee August 9, and Dr. Liggett ordered x-rays that same date. Dr. Liggett reviewed the reports of your x-rays taken August 9. on August 16, and noted there was no clinical needed for follow-up, based on the results. This notification was sent to you via mail: however. on that same date (August 16) he noted your report indicated an acute compression fracture involving right lateral tibia plateau with mild displacement and associated joint effusion. He submitted a consult referring you to an orthopedist for which you were seen September 7; at National Park Medical Center. The orthopedist noted your fracture and recommended non-weight bearing, a CT (to likely plan for surgery) and a follow-up after completion of the CT. Your CT was performed that same date (September 7) and your orthopedist follow-up was completed September 20, by Dr. Waldren at St. Vincent's. He recommended a hinged right knee brace and no running or jumping for six weeks. Dr. Vowell reviewed the recommendation that same date and ordered a knee immobilizer rather than a hinged brace which was issued the next day.

Your outside appointments were held within the timeframe allowed per policy; therefore your grievance is without merit.

(*Id*. at 28).

Plaintiff appealed this response, stating:

This response is very contradicting. First it states Dr. Liggett said that my injury does not need any clinical follow up. But as soon as I filed my first grievance 9/5/18 I was taken to see a specialist 9/7/18 if there was no clinical follow up needed then why would I be sent to a knee specialist. Who once he seen the x-ray he done in his office immediately ordered a CT scan done because he couldn't believe that a doctor would wait so long for treatment. The guy who done the CT scan stated he don't even know how I am moving as good as I was because my knee was or is completely out of socket and I would need surgery. This knee specialist also informed me as the response states: non-weightbearing on my knee until I can have surgery. But Dr. Liggett didn't take this specialist advise and waited almost three more weeks and sent me to another specialist which stated my knee is already healing so since the breakage is so old he recommend that I where a knee brace and apply weight on it which is also conflicting and the same. I conflicts because one

13

say don't add weight and the other say do but they both says my knee is broken out of socket,  I also have another grievance but the unit says it is the same as this one OR-18-01163 but it is not if my knee is displace then why was it not put back in place.

(*Id*. at 29).

The Appeal Response by Director Rory Griffin repeats the text of the Unit Level Response and Plaintiff's appeal.  It then states "The medical department's response is upheld, and your appeal is without merit.  I encourage you to utilize the sick call process to address your medical needs."  (*Id*. at 30).

Plaintiff provided a copy of the Unit Level Grievance form for **OR-18-01163**.  The form is signed September 18, 2028, with the Step Two portion of the grievance dated September 22, 2028.  (ECF Nos. 10-1 at 30; 62 at 46).  According to records provided by the Medical Defendants, this grievance was rejected.  (ECF No. 57-1 at 22).  In this Grievance, Plaintiff stated: "On 8/9/18 my knee was broken.  Dr. Liggett x-rayed my knee the same day which showed him that my knee was broken; But yet instill Dr. Leggett didn't get me to a knee specialist until 9/7/18, almost a whole month later."   Plaintiff repeats some of the history of the situation and then ends his grievance with the statement that  "It is now 9/18/18 and I have not had the emergency knee surgery that the specialist at NPMC determined that I needed."  (*Id*.).

### 2.  Reddick Young and CCS

The ADC grievance policy requires that an inmate "must specifically name each individual involved for a proper investigation and response to be completed by the ADC."  (ECF No. 57-1 at 1, 7).  The text of the grievances makes it clear that Plaintiff did not name either Reddick Young or CCS in either of his exhausted grievances.  Further, he testified in his deposition that he did not remember if he had ever filed a grievance against either Reddick Young or CCS.  (ECF No. 57-2

at 6).  Plaintiff has, therefore, failed to administratively exhaust any grievances against Reddick Young and CCS and they should be dismissed as Defendants in this case.

### 3.  Dr. Liggett

That leaves Plaintiff's claims against Dr. Liggett for review.  The Medical Defendants' arguments regarding Dr. Liggett appear to rely on the ADC grievance procedural rule that only one issue may be raised per grievance.  (ECF No. 56 at 12-14).  If multiple issues are included, only the "main issue" will be investigated.  "Secondary issues that are not addressed are not deemed exhausted at the end of the process."  (ECF Nos. 56 at 12; 57-1 at 1).  Plaintiff argues that the ADC Grievance Policy permits the Chief Deputy/Deputy/Assistant Director to waive procedural requirements and process grievance appeals at their discretion.  (ECF No. 70 at 2-3) (citing ECF No. 57-1 at 14 ¶ 3)).  He argues that if the requirements are waived, and the grievance appeal processed, the grievance is then administratively exhausted.  (*Id*. at 3).

The Medical Defendants characterize the main issue in **OR-18-01125** as Plaintiff's failure to receive the results of his head and knee x-rays.  (*Id*. at 13).  They characterize the secondary issue to be the fact that Plaintiff had received no medical treatment of any kind as of September 5, 2018, the initiation date of the grievance.  (*Id*.).  They also argue that Plaintiff did not make an allegation in this case regarding Dr. Liggett's failure to provide x-ray results.  While OR-18-01125 does begin with Plaintiff complaining that he "had yet to hear anything of the results or the condition of my head and knee," the Medical Defendants' parsing of the "main" and "secondary" issues in OR-18-01125 seems contrary to the record before the Court and common sense: the main issue was clearly Plaintiff's concern that he was not receiving medical treatment, and Dr. Liggett's failure to notify him of the results of x-rays was secondary.  Given that the grievance was found to be without merit because Dr. Liggett noted that no follow-up medical care was needed,

apparently for both for the week it took him to read the x-rays and after reading them, the lack of medical care was explicitly addressed in the grievance response.  Accordingly, the Court finds that both the "main" and "secondary" issues in OR-18-01125 were exhausted.

The Medical Defendants characterize the main issue in **OR-18-01162**, initiated on September 20, 2018, as Plaintiff's allegation that he had seen a knee specialist that day, who told him that his knee was broken and out of socket, but because so much time had passed, it had started to heal.  (ECF No. 56 at 13).  They characterize the secondary issue as Plaintiff's allegation that Dr. Liggett had sent him to two specialists, but only took the advice of the second specialist.  (*Id*.).  They argue the Health Services Response only addressed the main issue, per policy.  They further argue that the Response outlined his medical care between August 9 through September 20 and found the recommendations of the outside specialist were followed by Dr. Vowell, not Dr. Liggett.  Further, the outside appointments occurred within the time frame allowed per policy.  This response was upheld by Director Griffin.  (ECF No. 56 at 13-14; 57-1 at 30).  As such, the Medical Defendants conclude that Plaintiff failed to exhaust this grievance against Dr. Liggett, even though the grievance itself was exhausted.  (ECF No. 56 at 14).

The text of Plaintiff's grievance clearly identifies Dr. Liggett as the reason he was not taken to the specialists in a timely manner.  Further, the Response explicitly names Dr. Liggett as the physician responsible for Plaintiff's care.  Dr. Vowell is not mentioned until the end of the Response, where it notes that she reviewed the recommendation of the second knee specialist Plaintiff on September 20, 2018, the same day as his appointment with that specialist.  (ECF No. 57-1 at 28).  This Response was upheld by Director Griffin.  (ECF No. 57-1 at 30).  Plaintiff has, therefore, exhausted his claims against Dr. Liggett as to the delays Plaintiff underwent before seeing both specialists.  Further, even though Dr. Vowell is listed as the physician who reviewed

the recommendation of the second specialist, a material question of fact remains as to which CCS physician was in charge of Plaintiff's care at which point in time. Specifically, Plaintiff states he was told that Dr. Liggett retired at some point after the August 9, 2018, incident. Plaintiff provided a copy of Dr. Liggett's Interrogatory answers. (ECF No. 70-1 at 1). In this document, Dr. Liggett states he worked for Correct Care Solutions, LLC for two years beginning September 26, 2016 (*Id.*), which indicates that he was employed by CCS as a physician until September 26, 2018.

Thus, Plaintiff has exhausted these two grievances as to both Dr. Liggett and the denial and delay of medical care from August 9, 2018 through September 20, 2018. Further, a material question of fact remains as to which CCS physician oversaw Plaintiff's care at which point in time. Accordingly, summary judgment based on exhaustion is not appropriate as to Plaintiff's claims against Dr. Liggett.

**B.    Administrative Exhaustion – Lt. Clark**

Lt. Clark notes that Plaintiff filed only one grievance against him on topics related to this case: **OR-18-01280**. (ECF No. 67 at 6). In this grievance, Plaintiff states that Lt. Clark arrested him, took away his prescribed wheelchair and crutches, and forced him to limp to Isolation in violation of his medical "script." This caused his leg to swell and caused excruciating pain. (ECF No. 68-3 at 1-8). Lt. Clark argues that OR-18-01280 was not administratively exhausted until January 4, 2019. (ECF No. 67 at 7; 68-3 at 8). As Plaintiff filed this case on December 31, 2018, he failed to administratively exhaust this grievance before filing this lawsuit. (ECF No. 67 at 7).

Plaintiff argues that the Court ordered him to file an Amended Complaint and advised him that the Amended Complaint superseded the original Complaint. (ECF No. 74 at 3). The Amended Complaint should, therefore, be considered the beginning of this case. As his Amended Complaint

was filed on January 22, 2019 (ECF No. 10), OR-18-01280 was administratively exhausted prior to the filing of the case. (*Id*.).

The Eastern District of Arkansas recently addressed an argument identical to Plaintiff's in *Tyler v. Kelley*, 5:17CV00239-JLH-JTK, 2018 WL 1528784, at *3 (E.D. Ark. Mar. 2, 2018), *report and recommendation adopted*, 5:17CV00239-JLH, 2018 WL 1526017 (E.D. Ark. Mar. 28, 2018). The *Tyler* court found that Plaintiff failed to exhaust his administrative remedies prior to filing the case, stating:

> The Court also does not agree with Plaintiff that the PLRA exhaustion requirement can be "adjusted" or altered by subsequent inmate filings, such as in this case, the filing of an amended complaint. Rather, the court in *Johnson* clearly stated that an inmate "must exhaust administrative remedies *before* filing suit in federal court. . . . If exhaustion was not completed at the time of filing, dismissal is mandatory." 340 F.3d 624, 627 (8th Cir. 2003) (emphasis in original). The same argument raised by Plaintiff Tyler also was rejected in *Dunahue v. Bolden*, where the court declined to find that the filing of an amended complaint extended the deadline to complete the ADC grievance process. No. 5:16CV00105BSM/JTR, 2016 WL 765067[3] n. 3. "Dunahue's argument is contrary to the PLRA and Eighth Circuit precedent which clearly establish that exhaustion of administrative remedies must be completed '*before filing*' or '*commencing*' a federal lawsuit." *Id.*, citing 42 U.S.C. § 1997e(a), and *Johnson*, 340 F.3d at 627.

*Id*. at *3.

Here, Plaintiff filed his original Complaint on December 31, 2018, and OR-18-01280 was not administratively exhausted until January 4, 2018. Thus, he failed to exhaust his administrative remedies against Lt. Clark for this grievance, which alleges that Clark took away his prescribed wheelchair and crutches and forced him to limp to Isolation in violation of his medical "script."

**C.    Administrative Exhaustion Exceptions**

The Eighth Circuit Court of Appeals has recognized two exceptions to the PLRA exhaustion requirement: (1) when officials have prevented prisoners from utilizing the grievance procedures, or (2) when the officials themselves fail to comply with the grievance procedures. *See*

*Gibson v. Weber,* 431 F.3d 339, 341 (8th Cir. 2005) (citing *Miller v. Norris*, 347 F.3d 736 (8th Cir. 2001) (explaining that a prisoner is only required to exhaust those administrative remedies that are available and any remedies that prison officials prevent a prisoner from utilizing are not considered available)). "Available remedies are capable of use for the accomplishment of a purpose: immediately utilizable and accessible." *Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015) (internal quotations and modifications omitted).

In his Second Amended Complaint, Plaintiff alleges:

> I was unable to write a grievance on those issues because the correctional officers always informed me that they was not allowed to give me one of their ink pens to write with and policy prohibits them from getting a pen from another inmate and bring it to me after. I finally ended up with a grievance five days later after the incident – ADC policy states you can't grieve an issue over 15 days later. I was held in isolation for three weeks.

(ECF No. 62 at 9).

The Court must consider the facts set forth in a plaintiff's verified complaint when ruling on a summary judgment motion. A verified complaint is the equivalent of an affidavit for summary judgment purposes. *See, e.g., Roberson v. Hayti Police Dep' t.*, 241 F.3d 992, 994-95 (8th Cir. 2001).

Plaintiff's reference to ending up with a grievance five days after the incident is ambiguous on its face, in that it is not clear if he is stating he was unable to file a grievance until five days after he was injured, or five days after he was released from Isolation. He does, however, clearly state that he was in Isolation for three weeks, starting on August 9, 2018, and the first grievance filed concerning the incident was filed on September 5, 2018. Thus, taking Plaintiff's allegations in the light most favorable to him, as the Court must, a genuine issue of material fact exists as to whether Plaintiff was kept from utilizing the ADC grievance procedure while in Isolation, and, accordingly, whether he had any available administrative remedies during that time.

The rejection of Grievance OR-18-01163 also raises a question of material fact as to whether that rejection prevented Plaintiff from utilizing the ADC grievance procedure. According to Plaintiff, it was rejected as a duplicate of OR-18-00162. A careful reading of OR-18-01163, however, indicates that Plaintiff is correct in arguing that it is not a duplicate of OR-18-00162. For example, while there is certainly some overlap between the two grievances, in OR-18-01163 Plaintiff emphasizes Defendant Liggett's "extreme delay" and emphasizes that he has still not been scheduled for emergency knee surgery after it was prescribed by the National Park Medical Center knee specialist on September 7, 2018. In contrast, OR-18-01162 makes no mention of this emergency surgery. Instead, the crux of OR-18-01162 appears to be Dr. Liggett's delays in getting Plaintiff to both outside specialists for care. (ECF No. 57-1 at 27). This interpretation is supported by the grievance response for OR-18-01162, which states that Plaintiff's "outside appointments were held within the timeframe allowed per policy." (*Id*. at 28). Again, taking Plaintiff's allegations in the light most favorable to him, a genuine issue of material fact exists as to whether Plaintiff was prevented from utilizing the ADC grievance procedure by an incorrect rejection of OR-18-01163.

## IV.    CONCLUSION

Accordingly, it is recommended that the Motion for Partial Summary Judgment on the Issue of Exhaustion by the Medical Defendants (ECF No. 55) be GRANTED in PART and DENIED in PART.

- The motion to dismiss Dream Reddick Young and CCS as Defendants in this case should be GRANTED and Plaintiff's claims against them should be DISMISSED WITHOUT PREJUDICE.[8]

---

[8] Claims that are dismissed for failure to exhaust administrative remedies should be dismissed without prejudice. *See Sergent v. Norris*, 330 F.3d 1084, 1085 (8th Cir. 2003) (per curiam).

- The motion to limit Plaintiff's claims against Dr. Liggett to his delay in getting Plaintiff to a specialist for medical treatment for his knee from August 9, 2018 to September 7, 2018, should be DENIED. Instead, it is recommended that Plaintiff's claims against Dr. Liggett for delay and denial of medical care encompass the timeframe of August 9, 2018 to September 20, 2018.

It is further recommended that Lt. Clark's Motion for Partial Summary Judgment on Exhaustion (ECF No. 66) be GRANTED, and Plaintiff's claims against him for deliberate indifference to Plaintiff's medical needs be DISMISSED WITHOUT PREJUDICE. Plaintiff's claim against him for denial of access to courts remains for further review.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 1st day of July 2020.

/s/ *Mark E. Ford*
_____
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE