IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

OLAJUWON SMITH                                                                                    PLAINTIFF

v.                                          Civil No. 6:19-CV-06003

LIGGETT and ADAM CLARK                                                                 DEFENDANTS

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil rights action filed under 42 U.S.C. § 1983. Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) (2011), the Honorable Robert T. Dawson, United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.

Currently before the Court are motions for summary judgment on the merits by Defendant Clark (ECF No. 91) and Defendant Liggett (ECF No. 95).

### I.   BACKGROUND

Plaintiff filed his Complaint in the Eastern District of Arkansas on December 31, 2018. (ECF No. 2). It was transferred to this District on January 3, 2019. (ECF No. 4). Plaintiff filed an Amended Complaint on January 22, 2019. (ECF No. 10). Plaintiff alleges he was denied medical care by Correct Care Solutions ("CCS") and CCS employees, Defendants Dr. Liggett and Reddick Young, on August 9, 2018. (ECF No. 10 at 4). In an attachment to his Complaint (ECF No. 10-1), Plaintiff provided additional details concerning his claims. Plaintiff alleges he had been complaining to CCS about knee problems for two years. (*Id*. at 1). He was then attacked by three other inmates and his knee was "broken" on August 9, 2018. (*Id*.). He states his knee would not have been broken from the attack if CCS had done something about his knee earlier. (*Id*.). He was seen by Dr. Liggett that same day, while he was bleeding "profusely" and his leg was swollen. His leg was x-rayed, and he was taken to isolation. He was still bleeding and was given no pain

1

medication. (*Id*. at 2). Plaintiff alleges he was kept in the isolation cell with no crutches or other way to move and given only one Naproxen a day for three weeks. (*Id*.). He was not examined further by Dr. Liggett during the time in isolation. (*Id*.). He was not given crutches or a wheelchair when released from isolation, and he had to have other inmates carry him to meals. (*Id*.). Plaintiff alleges Dr. Liggett and CCS told him that it was policy to send victims of extreme violence to isolation and that this "was something they have always done." (ECF No. 10 at 5). Plaintiff alleges that Dr. Liggett has several grievances filed against him for ignoring and delaying treatment for serious inmate medical needs. Finally, Plaintiff alleges it is a custom of CCS to backdate computer files to show treatment being provided on an earlier date than when it was actually provided. (ECF No. 10 at 5).

Plaintiff was examined by a knee specialist at the National Park Medical Center ("NPMC") on September 7, 2018. This specialist told him his knee was "completely out of place" and he needed surgery, but he would need a CT scan first to determine the type and magnitude of surgical procedure needed. (ECF No. 10-1 at 3). Plaintiff alleges the specialist told him that his knee was completely "out of socket" and that, for an injury of this type, treatment should not be delayed any longer than two weeks. (*Id*. at 3-4). He further told Plaintiff that if there was much more of a delay prior to surgery he would have to rebreak the knee to put it back in the correct position. (*Id*.). He received the CT scan and the recommendation for surgery was given to Reddick Young. (*Id*. at 4).

Plaintiff alleges that 20 days later he was taken to a second knee specialist at CHI St. Vincent's Hospital. (ECF No. 10-1 at 4). This specialist took an x-ray of his knee and told him it was now too late to perform surgery on the injury, and instead put him in a knee immobilizer[1] and

---

[1] Plaintiff calls the medical device a "knee mobilizer," but from the context of his allegations it appears he is referring to a knee "immobilizer."

applied pressure. (*Id*.). The specialist told him that if he had been brought to him sooner, he would have recommended surgery. (*Id*.). Plaintiff alleges that Reddick Young deliberately ignored the first knee specialist's recommendation and waited a substantial amount of time to send him to a second specialist. (*Id*. at 4-5). Plaintiff alleges that his knee is still extremely swollen, and he is in extreme pain. He asked to go to a third specialist, but this request was denied. (*Id*. at 5). He alleges the CCS staff gave him a script for a wheelchair and crutches, but nothing was given for the swelling and pain. (*Id*.). He claims his knee is dislocated, and something is crushed inside of it. (*Id*. at 2). Every nurse he sees at sick call tells him something needs to be done about his knee and refers him to see a doctor. (*Id*. at 5).

Plaintiff was taken back to the second knee specialist on November 26, 2018. (ECF No. 10-1 at 7). The specialist advised that he continue to use the knee immobilizer and rest his leg in an elevated position. (*Id*.). Plaintiff continues to receive no pain medication other than Naproxen. (*Id*.).

He alleges that Defendant Clark interfered with the treatment ordered by the doctor and denied him access to courts on October 14 or 15 of 2018. (ECF No. 10-1 at 5). Defendant Clark arrested Plaintiff for contraband on October 14, 2018. He removed Plaintiff from his wheelchair and made him walk from the barracks to the infirmary and then to isolation. (*Id*. at 6). Plaintiff had orders that he was to have a combination of the knee immobilizer and either crutches or a wheelchair for mobility, but Defendant Clark denied him all of these. (*Id*.). This caused his entire leg to swell and increased his pain. (*Id*.). Plaintiff was ultimately acquitted of the disciplinary charge for the incident. (*Id*. at 5). Defendant Clark also allegedly destroyed Plaintiff's legal work. (*Id*. at 6-7).

Near the end of the attachment to his Complaint form, Plaintiff states "this is not part of the lawsuit just showing a custom or pattern of CCS changing dates in the computer and to explain why the grievance of 9/5/18 contradict itself." (ECF No. 10-1 at 7). He then describes an incident when he was released from administrative segregation and states there was no way the script for his knee immobilizer and crutches could have been written on the date listed in the computer system. (*Id*. at 8).

Plaintiff proceeds against all Defendants in both their official and personal capacities. (ECF No. 10 at 4-5). He seeks compensatory and punitive damages, and he wants an injunction to prevent Defendant Clark from interfering with his or other inmates' legal paperwork in the future. (*Id*. at 7).

CCS filed a Motion to Dismiss on May 2, 2019. (ECF No. 20). Plaintiff filed a response on June 4, 2019. (ECF No. 30). On December 30, 2019, Plaintiff filed a Motion to Amend his Complaint. (ECF No. 52). On January 14, 2020, the Motion to Dismiss was denied. (ECF No. 53).

On January 22, 2020, the Medical Defendants filed their Motion for Partial Summary Judgment on the Issue of Exhaustion. (ECF No. 55). On January 23, 2020, Plaintiff's Motion to Amend was granted, and he was directed to file a Second Amended Complaint. (ECF No. 58). He did so on February 2, 2020. (ECF No. 62).

In his Second Amended Complaint, Plaintiff provided additional detail to his First Amended Complaint, and he adds a claim that Defendant CCS/Wellpath[2] has a custom or policy of backdating, withholding, and falsifying evidence in their computer system to "cover up there [sic] denial of medical care. . . ." (ECF No. 62 at 1). Plaintiff had previously noted issues with

---

[2] During the pendency of this lawsuit, CCS and several other prison medical providers merged to form WellPath, LLC.

medical data entry is his First Amended Complaint, but stated "this is not part of the lawsuit just showing a custom or pattern of CCS changing dates in the computer and to explain why the grievance of 9/5/18 contradict itself." (ECF No. 10-1 at 7).

Plaintiff alleges he wrote an emergency grievance about his knee on October 17, 2017, after he first saw Dr. Liggett upon his transfer to the Ouachita River Unit from the Varner Unit. (ECF No. 62 at 8). Plaintiff attached a copy of the Unit Level grievance form, dated November 6, 2017, to his Second Amended Complaint.[3] (*Id*. at 23). His knee complaints were ignored, and then the knee was broken[4] on August 9, 2018. (*Id*. at 8). Instead of calling for an ambulance, Dr. Liggett told the guards he was "done with" Plaintiff and to take him to Isolation. Plaintiff alleges Dr. Liggett sent him to Isolation with "blood still running out of my head," no pain medication, and no way to move around because his wheelchair was confiscated. (*Id*. at 9). Plaintiff was in Isolation for three weeks and heard nothing from Dr. Liggett the entire time he was there. Plaintiff repeated his complaints about the conditions and lack of medical treatment in Isolation. (*Id*.). Plaintiff also alleges:

> I was unable to write a grievance on those issues because the correctional officers always informed me that they was not allowed to give me one of their ink pens to write with and policy prohibits them from getting a pen from another inmate and bring it to me after. I finally ended up with a grievance five days later after the incident – ADC policy states you can't grieve an issue over 15 days later. I was held in isolation nearly three weeks. (*Id*.).

---

[3] This emergency grievance does note that he had been having pain and swelling in his knee, and Dr. Liggett felt something in the joint, but told Plaintiff that he had "milked that knee pain for three months" and should "stop complaining." It does not appear, however, that it progressed to Step Two of the grievance procedure, and was therefore not exhausted.

[4] In the Grievance Appeal Response for OR-18-01162, Plaintiff's injury was described as "an acute compression fracture involving right lateral tibia plateau with mild displacement and associated joint effusion." (ECF No. 57-1 at 28). The response also noted that Defendant Liggett ordered x-rays of the knee the day it was injured on August 9, 2018, reviewed them on August 16, 2018, noted there was no clinical need for follow-up, and scheduled an orthopedic consult for September 7, 2018.

A sick call nurse told Plaintiff he needed to stay off his knee because something inside of it was crushed, and he had an appointment scheduled for September 7, 2018. (ECF No. 62 at 10). Plaintiff saw his first knee specialist at National Park Medical on September 7, 2018, where a CT scan was done that day. Plaintiff believes Reddick Young is the individual who approved the CT scan because discovery in the case revealed that such approvals are part of her job. (*Id*.)

Plaintiff alleges he put in another grievance on September 18, 2018, complaining about how the National Park Medical Center doctor recommended emergency surgery, but he had yet to go back to the hospital for that surgery. He alleges that Dr. Liggett and Reddick Young deliberately ignored his "serious medical need for surgery. (ECF No. 62 at 11). He was then sent to a different specialist on September 20, 2018, as described in his First Amended Complaint. (*Id*.). After seeing the second specialist, he came back and wrote another grievance that same day. He alleges that the medical department is run by Dr. Liggett and Reddick Young, and asks to see a third specialist, again noting that the "extreme delay" had interfered with his treatment options. (*Id*. at 12).

Plaintiff alleges that, during the pendency of this case, he was transferred to the East Arkansas Regional Unit, and has now been seen by a third specialist at the University of Arkansas for Medical Sciences. (ECF No. 62 at 12-13). This specialist repeated that an injury like his should have been treated within two weeks, and that to fix the problem now he would have to rebreak the bone. Additionally, there is now a hole in Plaintiff's bone from the injury which he would have to "drill around to properly sit one bone on top of the other." (*Id*. at 13). He would then need to shave Plaintiff's bones down to make them fit again, and one of Plaintiff's legs would be shorter than the other. This specialist also told him that he believed that attempting to fix his knee now would likely do more harm than good. (*Id*.). The comments and prognosis this specialist

6

sent back to the ADC stated that the prison had been negligent in getting Plaintiff to a hospital in a timely manner. (*Id*. at 14).

Plaintiff repeats his claim that Defendant Clark interfered with his medical treatment plan when he forced him to walk to isolation and stripped him of his medical supplies for a disciplinary charge that was ultimately dismissed. (*Id*. at 6, 18-19). Plaintiff also alleges Defendant Clark destroyed legal work while he was in Isolation, causing him to have difficulty with a hearing in another case on January 8, 2019. (*Id*. at 19-20). Plaintiff characterizes the destruction of his legal paperwork as a denial of access to courts. (*Id*. at 6, 22). Plaintiff proceeds against all Defendants in both their official and individual capacities. (*Id*. at 4-6).

Defendants Liggett, Young, and CCS (the "Medical Defendants") filed their Motion for Partial Summary Judgment on the Issue of Exhaustion on January 22, 2020. (ECF No. 55). Defendant Clark filed his Motion for Partial Summary Judgment on Exhaustion on February 11, 2020. (ECF No. 66). Plaintiff filed his Response to the Medical Defendants' motion on February 13, 2020. (ECF Nos. 70, 71). He filed his Response to Defendant Clark's motion on March 5, 2020. (ECF Nos. 74, 75). Defendant Clark filed a Reply to Plaintiff's Response on March 12, 2020. (ECF No. 78).

On July 2, 2020, the undersigned entered a Report and Recommendation. (ECF No 83). It was recommended that the motion for summary judgment on exhaustion be granted as to Defendant Young and CCS, and Plaintiff's claims against them should be dismissed without prejudice. (*Id*. at 20). It was further recommended that Defendant Liggett's motion for summary judgment on exhaustion be denied, but that Plaintiff's claims be limited to the period of August 9, 2018, through September 20, 2018. (*Id*. at 21). As to Defendant Clark, it was recommended that Plaintiff's claim against him for deliberate indifference as to his medical needs be dismissed

without prejudice, but that the claim for denial of access to courts should remain for further review. (*Id*.)  The Report and Recommendation was adopted *in toto* by the Honorable Robert T. Dawson, Senior United States District Judge, on September 29, 2020.  (EC No. 86).

Defendant Clark and Defendant Liggett each filed their respective Motions for Summary Judgment on the merits on November 13, 2020.  (ECF Nos. 91, 93-94, 95-97, 99).  Plaintiff filed his Response in Opposition on December 7, 2020.  (ECF Nos. 100-101).  Defendant Liggett filed a Reply on December 14, 2020.  (ECF No. 102).  Plaintiff filed a Response on December 28, 2020.  (ECF No. 103).

## II.     LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.     ANALYSIS

#### A.  Defendant Clark

Plaintiff's Response and Reply fail to mention Defendant Clark and make no attempt to address Clark's arguments.  Defendant Clark's facts are, therefore, deemed admitted pursuant to Local Rule 56.1(c).  Based on these facts, Defendant Clark was the shift supervisor on duty when a search of Plaintiff's cell was conducted.  (ECF No. 93 at 2).  He did not participate in the search, did not see anyone touch Plaintiff's legal work, and did not instruct ADC officials to destroy any of Plaintiff's property.  (*Id*.).  According to Plaintiff's deposition testimony, he did not miss any court deadlines in any case in the months following the cell search.  (*Id*. at 3; 91-2 at 13-14).

An inmate cannot prevail on an access-to-courts claim unless he can demonstrate he suffered prejudice or actual injury as a result of the prison officials' conduct.  *See Lewis v. Casey*, 518 U.S. 343, 351-2 (1996); *see also Farver v. Vilches*, 155 F.3d 978, 979-80 (8th Cir. 1998) (per curiam); *Klinger v. Dep't. of Corr.,* 107 F.3d 609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic); *McMaster v. Pung,* 984 F.2d 948, 953 (8th Cir. 1993).  "To prove a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim.'"  *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008) (citations omitted).

As Plaintiff suffered no actual injury or prejudice to any case after the cell search, there is no question of material fact and summary judgment in Defendant Clark's favor is appropriate as a matter of law for Plaintiff's denial of access to courts claim against him.

### B.  Defendant Liggett

Defendant Dr. Liggett argues that he is entitled to summary judgment on the merits for the following reasons.  He ordered x-rays taken on August 9, 2018, personally reviewed them, and "did not see anything in them that warranted emergency treatment by an outside provider."  (ECF No. 96 at 7).  He was absent from the ADC unit "over the next several days" after he saw Plaintiff on August 9th, and he does not know why the radiologist's report for the initial x-rays were not given to another doctor for review while he was out.  (*Id.*).  When he reviewed the radiology report on August 16, 2018, the report indicated that Plaintiff had a "compression fracture of the right tibia plateau with mild displacement."  (*Id.* at 8).  In Dr. Liggett's opinion, the fracture was "stable" and "subtle" and emergency care was not needed.  (*Id.*).  He then ordered a non-emergency orthopedic consultation with an outside provider, and he was not involved further with the scheduling process.  (*Id.*).  Plaintiff made no complaints about his knee while he was in isolation.  (*Id.*).  Despite the request for an immediate CT scan by Dr. Hubbard (NPMC orthopedic surgeon) on September 7, 2018, there is no record that Dr. Hubbard recommended surgery or that Plaintiff's condition was urgent.  (*Id.* at 9).  Dr. Liggett's last day of work at the ADC was September 12, 2018.  (*Id.*).  Dr. Waldren (CHI St. Vincent's orthopedic surgeon) who saw Plaintiff on September 20, 2018, did not recommend surgery because the joint had already sufficiently healed.  (*Id.* at 10).  The ADC prefers continuity of care with their outside providers and did not engage in specialist-shopping for Plaintiff's knee.  Plaintiff was only taken to another hospital and another specialist because Dr. Hubbard had been deployed and NPMC refused to permit surgery on inmates at their facility.  (*Id.*

10

at 9-10). According to Dr. Horan, a Wellpath physician, Plaintiff's knee fracture was not an emergency, and in his opinion, Plaintiff had a good outcome with his knee without having to undergo the risk of surgery. (*Id*. at 11-12). And, because surgery was still an option on September 7, 2018, Dr. Liggett was not responsible for the fact that surgical intervention was no longer possible on September 20, 2018. (*Id*. at 12).

Based on the summary judgment record before the Court, several material questions of fact remain.[5] The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on his Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show that he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citation omitted).

For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions

---

[5] Because the Court agrees with many of Plaintiff's points, they will not be laid out separately here, but will instead be incorporated into the analysis.

does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Med. Servs*, 512 F.3d 488, 499 (8th Cir. 2008) (citation omitted). "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Id.*

It is well settled that "[a] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010) (internal citation omitted). An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Id.* (internal citations omitted). Despite this, issues of fact exist when there is a question of whether or not medical staff exercised independent medical judgment, and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference. *See Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990).

"A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an acute or escalating situation or that [these] delays adversely affected his prognosis[,]'" *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (citations omitted), unless the need for medical attention is obvious to a layperson, in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. *See Schaub*, 638 F.3d at 919 (citing *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999)); *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995); *cf. Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) ("noting that a delay in treatment, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation").

It is undisputed that Plaintiff's knee fracture was an objectively serious medical need. Turning to the subjective prong of deliberate indifference, based on the summary judgment record

before the Court, numerous questions of material fact remain for determination, including when Dr. Liggett knew Plaintiff's knee was fractured, and whether the fracture should have been treated as an urgent condition requiring Plaintiff to be taken for an emergency hospital consult.

In his affidavit, Dr. Liggett emphasizes that he was Board Certified in General Surgery and was the Chief Resident of Orthopedic surgery in Pima County, Arizona, giving him experience in orthopedics. (ECF No. 97-3 at 1). With this background and experience, one would presume that he should have been able to identify a knee fracture on Plaintiff's x-ray on August 9, 2018. (*Id*.). Yet, Dr. Liggett argues that he "did not see anything in the x-rays to warrant emergency medical treatment by an outside provider." (*Id*. at 1). He does not indicate the presence or absence of a knee fracture in the x-ray. Even if he had been unable to identify the fracture on August 9th, he read the radiology report (which expressly identified the presence of a fracture) on August 16th, but Dr. Liggett determined that the knee fracture was not a condition which required urgent care because it was "relatively stable," and just a "subtle" fracture. (*Id*. at 2). Dr. Liggett also argues that neither of the outside orthopedic surgeons expressly stated that Plaintiff's knee fracture was an urgent condition. Dr. Horan, also a WellPath employee, supports Dr. Liggett's opinion. (ECF No. 97-4).

The outside medical records, ADC medical records, and Plaintiff's allegations contradict Dr. Liggett and Dr. Horan. Dr. Hubbard requested permission to do a CT scan "ASAP," and received permission to do so immediately. (ECF No. 97-1 at 13-17). This CT scan identified two fractures in Plaintiff's right knee.[6] (ECF No. 97-1 at 20). In his verified Complaint,[7] Plaintiff

---

[6] The first fracture was identified as an "[a]cute, comminuted, depressed and impacted lateral tibial plateau fracture involving the articular surface of the proximal tibiofibular joint and extending distally into the metadiaphysis." The second fracture was identified as an "acute, oblique and nondisplaced fracture involving the medial aspect of the tibial metaphysis extending distally into the diaphysis." (ECF No. 97-1 at 20).

[7] The Court must consider the facts set forth in a plaintiff's verified complaint when ruling on a summary judgment motion. A verified complaint is the equivalent of an affidavit for summary judgment purposes. *See, e.g., Roberson v. Hayti Police Dep' t.*, 241 F.3d 992, 994-95 (8th Cir. 2001).

13

alleges Dr. Hubbard told him that his knee was completely "out of socket" and that, for an injury of this type, treatment should not be delayed any longer than two weeks. Plaintiff further alleges that he told him that if there was much more of a delay prior to surgery he would have to rebreak the knee to put it back in the correct position. When Plaintiff was examined by Dr. Waldren on September 20, 2018, eight days after Dr. Hubbard, and forty-two days after the injury, Dr. Waldren determined that the fractures had healed too much for surgical intervention; it was now too late to do surgery. (ECF No. 97-1 at 29). The fact that a mere eight-day delay was apparently critical to the available treatment options supports Plaintiff's argument that time was of the essence concerning his knee. Plaintiff further alleges that he was transferred to another ADC unit and has been seen by at least one specialist at UAMS who was highly critical of the long delay in getting Plaintiff to an outside hospital for medical treatment.[8] This specialist also told him that an injury like this must be treated within two weeks. The two August dates when Dr. Liggett decided to treat Plaintiff's knee fracture as non-urgent were both within the two-week timeframe for optimal surgical treatment. Further, these decisions caused a delay of either 22 or 29 days before Plaintiff saw Dr. Hubbard, eclipsing the eight-day delay between Plaintiff's exams with Dr. Hubbard and Dr. Waldren.

Next, a question of material fact exists as to whether surgery was indicated to treat Plaintiff's double knee fracture. Dr. Liggett argues, and Dr. Horan agrees, that neither of the outside orthopedic surgeons expressly wrote that surgery should be done; therefore, surgery was not needed. As discussed above, Dr. Waldren stated it was too late to do surgery by the time he

---

[8] It is unclear why Plaintiff's UAMS medical records were not included in the summary judgment record, as they would appear to be relevant to Dr. Liggett's argument that there was no verifiable medical proof of harm caused by the delay. As Plaintiff correctly notes in his responding documents, inmates at the ADC are not permitted to have copies of their medical records. Instead, they are only permitted to view their medical records and take notes. In the absence of these records, the Court must take Plaintiff's allegations as true.

14

examined Plaintiff. Dr. Hubbard's records state that the CT scan was ordered "to plan for surgery" and for "surgical planning." (ECF No. 97-1 at 13). A later notation in Dr. Hubbard's records states "may need surgical intervention." (*Id*. at 16). The ADC medical record notation by Dr. Vowell on September 12th states that "Inmate to see Dr. Waldren for subacute lateral tibial fracture with displacement. NPMC will not allow surgery to be done there, but Dr. Waldren @ CHI St. Vincent Hot Springs is willing to see patient and also perform surgery." (ECF No. 97-1 at 22, 36). Both Nurse Dream Redic-Young and Consult Scheduler Rhoda Washington state in their affidavits that NPMC would not permit surgery to be performed on an inmate due to security concerns, which is common for many outside medical providers. As a result, they "had to find a specialist who would see Plaintiff at a facility which would allow surgery." (ECF Nos. 97-5, 97-6).

A question of material fact also exists as to whether Dr. Liggett wrote a notification of diagnostic test results stating that Plaintiff needed no further clinical follow-up after reviewing Plaintiff's radiology report on August 16, 2018. Dr. Liggett argues that the notification was intended for the x-ray concerning Plaintiff's face,[9] not his knee, and that he ordered the orthopedic consult for the knee. (ECF No. 96 at 8). The notification itself makes no distinction as to either Plaintiff's face or knee; it simply states that it is informing Plaintiff of the results of the diagnostic test performed on August 9, 2018. (ECF No. 97-1 at 8). Plaintiff filed Grievance OR-18-01125 on September 5, 2018, stating that he had not yet been informed of the results of the knee and face x-rays taken on August 9, 2018. (ECF No. 62 at 28). The Health Services Grievance Response referenced Plaintiff's knee fracture, and it indicated that because Dr. Liggett noted no follow-up

---

[9] Plaintiff presented to Dr. Liggett on August 9, 2018, with injuries to his face and knee. Dr. Liggett ordered x-rays of both areas. (ECF No. 97-3 at 1).

was needed, Plaintiff's grievance was with merit. (*Id.*).[10] Thus, it does not appear that Health Services expected separate notifications for each type of x-ray.

Another question of material fact exists as to whether the delay in taking Plaintiff to an outside orthopedic surgeon adversely affected the medical prognosis for his double knee fracture. Dr. Liggett argues that he was not responsible for any delay in Plaintiff's treatment, and Plaintiff "was not medically damaged by the delays which did occur." (ECF No. 96 at 11). Dr. Horan opines that Plaintiff has stated that his knee only occasionally bothers him, that he was "incredibly lucky that he healed so well," and he attributes that healing to his being a young man. (ECF No. 97-4 at 4). He further opines that Plaintiff did not suffer a bad fracture, and was fortunate that he did not undergo surgery, which would have only a 50/50 chance of success. (*Id.*).

Plaintiff alleges in his verified Complaint that his knee is still extremely swollen, and he is in extreme pain. Every nurse he sees at sick call tells him something needs to be done about his knee and refers him to see a doctor. At least one specialist at UAMS repeated that an injury like his should have been treated within two weeks. He alleges that a UAMS orthopedic specialist told him that his knee had healed improperly, but to fix the problem now, he would have to rebreak the bone. Additionally, there is now a hole in Plaintiff's bone from the injury which he would have to "drill around to properly sit one bone on top of the other." He would then need to shave Plaintiff's bones down to make them fit again, and one of Plaintiff's legs would be shorter than the other. The specialist told him that he believed that attempting to fix his knee now would likely do more harm than good. In his summary judgment response, Plaintiff alleges that a third UAMS

---

[10] In the earlier Report and Recommendation on the issue of exhaustion, the Court believed that the phrase "with merit" had been a typographical error based on the context of the statement. With additional medical records and other documents available, however, it appears that there was no typographical error, and the grievance was actually found to be with merit.

16

specialist told him that there is now a 9mm punch-type hole in his knee, and due to the delay, there would only be a 50/50 chance of a successful surgery.  (ECF No. 100 at 11, 13).

Finally, a question of material fact remains as to which physician oversaw Plaintiff's care at which point in time.  Dr. Liggett argues that he was not at the unit for "several days" after August 9th, and his last day of working with the ADC was September 12, 2018; he was, therefore, not responsible for any delay in Plaintiff's medical treatment.[11]  (ECF No. 97-3).  It is not clear from the record exactly when Dr. Liggett was at the ADC unit between August 9 and August 16, 2018.  Nor is it clear when the radiology report was made available at the unit, although it was electronically signed by the radiologist at 9:15 p.m. on August 9, 2018.  (ECF No. 97-1 at 9).  Dr. Liggett also states he does not know why the radiology reports were not given to another physician while he was out of the unit.  (*Id*. at 2).  Plaintiff identifies Dr. Liggett as the physician in charge of his medical care.

Accordingly, several issues of material fact remain in this case, and Dr. Liggett is not entitled to summary judgment.

### IV.    CONCLUSION

Accordingly, it is recommended that Defendant Clark's Motion for Summary Judgment on the Merits (ECF No. 91) be GRANTED and Plaintiff's claim for denial of access to the courts be DISMISSED WITH PREJUDICE.  It is further recommended that Defendant Dr. Liggett's Motion for Summary Judgment on the Merits (ECF No. 95) be DENIED.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are**

---

[11] Dr. Liggett's official termination date was October 12, 2018.  Between September 12 and October 12, he took a floating holiday and the remainder of his personal time.  (ECF No. 97-2).

**reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 22nd day of June 2021.

/s/ *Mark E. Ford*

HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE